KEOKUK AND HAMILTON BRIDGE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10559. Promulgated February 28, 1949.

250

*E. W. McManus, Esq.*, and *J. O. Boyd, Esq.*, for the petitioner.
*Gene W. Reardon, Esq.*, for the respondent.

254

## OPINION.

HARLAN, *Judge*: The respondent contends that the petitioner is a corporation engaged in a business activity, that it is an entity separate and apart from its bondholders and/or the city of Keokuk, and, consequently, is subject to Federal taxation like any other taxable corporation upon the income derived from the operation of its bridge properties. The petitioner contends that it is not subject to tax upon this income, and its arguments in support of this contention will be considered in the order in which they are advanced on brief.

Petitioner urges that the conditions imposed by the gift proposal and the limitations upon the use of the revenues contained in the indenture of mortgage preclude it from having any gains, profits, or

income. Citing *Eisner* v. *Macomber*, 252 U. S. 189; *Helvering* v. *Edison Brothers Stores*, 133 Fed. (2d) 575; *Hirsch* v. *Commissioner*, 115 Fed. (2d) 656; *Crews* v. *Commissioner*, 89 Fed. (2d) 412; *Dallas Transfer & Terminal Co.* v. *Commissioner*, 70 Fed. (2d) 95, and others, petitioner urges that, in order to have "income" as that term is used in the Sixteenth Amendment to the Constitution and in the Internal Revenue Code, it must realize a gain or profit which it can apply to its "separate use, benefit and disposal." The cited cases so held. We do not agree, however, that, because petitioner was bound by the terms of the gift proposal and the indenture of mortgage to apply the revenues from the toll bridge first to the payment of maintenance and operating expenses and secondly to interest and principal on its bonds, it did not receive a gain or profit for its separate use and benefit. It is not unusual for a corporation to agree, as did the petitioner, to apply its profits to the payment of a mortgage indebtedness. Action taken pursuant to such an agreement results in a reduction of its liabilities and is an application of profits to its separate use and benefit. And the fact that it had entered into an escrow agreement providing that title to the mortgaged property shall pass to a city when the indebtedness is paid, and that each payment accelerated the time when the city will acquire title, does not detract from the nature of the revenues derived from that property during the period it is owned and operated by petitioner. Any person may decide to give his property to another after it is paid for, and may even enter into a binding agreement to do so, but in the interim any revenue derived from that property is his income, and, unless it falls within the exemption provisions of the statute, is taxable to him. The petitioner received "income" from the operation of the bridge property within the meaning of that term as used in the Sixteenth Amendment and in the Internal Revenue Code, even though it was bound by the provisions of the gift proposal and the mortgage indenture to apply that part which remained after payment of expenses to the reduction of its bonded indebtedness. Cf. *Amalgamated Housing Corporation*, 37 B. T. A. 817; affd., 108 Fed. (2d) 1010.

Furthermore, all that has been said concerning the benefit to the petitioner from the reduction of its debt through the application of the toll payments received to said debt becomes even more evident when it is considered that petitioner herein might, in the event some governmental or private organization would build a bridge within five miles of petitioner's bridge, retain the bridge as its own property and never deliver it to the city of Keokuk, in which event all the money received

by petitioner during the taxable years would inure to its own enrichment.

Petitioner also urges that the revenues which it collected and applied to the payment of its indebtedness are not income because they replaced the capital procured for the acquisition of the bridge property. That the revenues in excess of expenses were used to replace the capital which petitioner borrowed from the insurance companies is not disputed. But these revenues were not paid to petitioner for the purpose of reimbursing it for a capital expenditure. They represented toll charges received from its patrons for the use of the bridge. In this respect the facts in the instant proceeding differ from *Decatur Water Supply Co.* v. *Commissioner*, 88 Fed. (2d) 341; *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628, and related cases, cited by the petitioner. In the *Decatur* case, upon which petitioner places strong reliance, the city of Decatur, Illinois, desired to enlarge and extend its water supply system. Due to constitutional debt limit restrictions, it became necessary for the city to organize the Decatur Water Supply Co. for the purpose of having it acquire the land needed for the reservoir basin in connection with a new dam to be constructed by the city. Public spirited citizens subscribed to the new company's capital stock. The charter issued by the city provided for the dissolution of the company and conveyance of its reservoir land to the city upon the retirement of the capital stock. The city operated the water system. The water collections were made by the city and were used to pay the city's expenses of operating its water system, and 90 per cent of the excess was distributed to the company for the payment of dividends and retirement of its capital stock. The company paid a tax upon the sums paid as dividends to its stockholders, but contended that the payments in retirement of its capital stock did not constitute taxable income to it. The Circuit Court of Appeals for the Seventh Circuit agreed with the petitioner's contention on the ground that the payments came to it from the city burdened with the unalterable obligation to return them to the preferred stockholders in retirement of capital, and it held that they were not taxable income. In the course of its opinion the Circuit Court discussed the *Cuba Railroad* case and stated that the analogy between the facts of that case and those involved in the *Decatur* case was pronounced. In the *Cuba Railroad* case the Supreme Court held that subsidy payments made by the Republic of Cuba to a railroad company were reimbursements for capital expenditures and were not income within the meaning of the Sixteenth Amendment. In reaching this conclusion the Court stated that the contributions were not profits or gains from the use or operation of

the railroad and were not made for services rendered or to be rendered, and the logical inference is that, if they had been, the court would have held that they represented income when received and not a replacement of capital. The revenues realized by the petitioner from the operation of the bridge are not exempt from tax as amounts received to replace capital or reimburse it for capital expenditures.

Section 116 (d) of the Internal Revenue Code provides for the exemption from Federal taxation of income derived from any public utility or the exercise of any essential governmental function and accruing to any political subdivision of a state. Petitioner urges that its income is exempt from tax under this provision of the statute. It argues that a reading of the gift proposal and accompanying documents indicates a delivery of title and intention to vest a present interest in the bridge property in the city of Keokuk, subject, however, to a defeasance or reverter if certain conditions were not performed; that the city thus became the owner of the property; that petitioner is a mere instrumentality created by the city to manage the property and collect and handle the revenues so that the city may acquire the bridge and make it free of tolls; that in maintaining and operating the bridge it acted as an instrumentality of the city engaged in the exercise of an essential governmental function; and that the income accrued to the city.

We are unable to agree with the petitioner. During the taxable years the deed to the bridge property was held by the escrow agent in accordance with the escrow agreement. The "distinctive feature of an escrow is the delivery of a deed to a third person to await the performance of some condition whereupon the deed is to be delivered to the grantee and the title is to pass, the depository being the agent of both parties, and the instrument not being effective as a conveyance until the condition is performed." 8 R. C. L. 994. To the same effect, see *Jackson* v. *Rowley*, 88 Iowa 184; 55 N. W. 339, 340. The escrow agreement provides that the escrow agent is to hold the deed until advised, among other things, that "all of the bonds secured by said indenture have been paid in full, or that funds have been deposited with the trustee sufficient to redeem and retire all of the outstanding bonds," and, upon receipt of such advice, the escrow agent is authorized and instructed to deliver the deed to the city. The agreement also provides that in the event the escrow agent is advised by the consulting engineers that construction of another bridge has been commenced within five miles of the existing bridge, it is authorized and instructed to deliver the deed and other instruments then in its hands to the petitioner. The gift proposal provides that on "the final payment of

said First Lien Revenue Bonds and all interest thereon, * * * and on the due performance of all the conditions herein specified, * * * then the depositary shall deliver the title papers to the Donee, and the management shall turn over said property to said City." We think it is clear from these provisions that delivery of the deed to the city was to await the performance of the enumerated conditions, and that the apparent intention was that the city was not to acquire title to or ownership of the bridge property pending such performance.

In support of its contention that the city was the owner of the bridge property during the taxable years, the petitioner points to the provision of the gift proposal that a failure on the part of the city "to comply with any or all of the conditions attached to this gift shall operate as a forfeiture of all the rights of the Donee hereunder and said property shall revert to the Donor, and all the right, title and interest in and to said property and to said franchise or franchises shall revert to and revest in the Donor as fully and completely as if this instrument had not been executed * * *." Petitioner urges that the use of the words "revert" and "revest" indicates that title to the property was vested in the city during the taxable years, subject to reverter. We do not agree. An examination of the gift proposal shows that the only conditions imposed therein upon the city were that after the payment of the bonds and delivery of the conveyance the bridge should be forever free to vehicular and pedestrian traffic and should be maintained by the city in a state suitable for such traffic. Inasmuch as failure on the part of the city to perform these conditions could occur only after the bonds were paid and ownership of the bridge acquired by it, the use of the words "revert" and "revest" in connection with the return of the property to petitioner in the event the city failed to comply with these conditions was proper. They have no bearing, however, upon the ownership of the bridge property during the taxable years, when the bonds were still the outstanding indebtedness of petitioner and the deed had not been delivered to the city by the escrow agent.

Our conclusion from the foregoing is that during the taxable years the ownership of the bridge property remained in the petitioner. It collected the revenues from the operation of the bridge, and these revenues, after paying maintenance and operating expenses, were applied to the payment of principal and interest on its indebtedness to the bondholders. While it was a public utility (cf. *Clarksburg-Columbus Short Route Bridge Co.* v. *Woodring*, 89 Fed. (2d) 788), none of its

income accrued to the city. The real beneficiaries of its operations during the taxable years were the bondholders. It was not an agency or instrumentality of the city engaged in an essential governmental function. It was a private corporation, organized under the laws of Delaware. It paid property taxes levied on its property by the local taxing authorities. It was managed and controlled by its own officers and directors, and none of its stock was owned by the city. It is not entitled to exemption from taxation on its income under the provisions of section 116 (d) of the code. *Citizens Water Co.*, 32 B. T. A. 750; affd., 87 Fed. (2d) 874; *City of Burlington* v. *United States*, 148 Fed. (2d) 887; *Bear Gulch Water Co.*, 40 B. T. A. 1281; affd., 116 Fed. (2d) 975; certiorari denied, 314 U. S. 652. Cf. *Appeal of City of Dubuque Bridge Commission*, 232 Iowa 112; 5 N. W. (2d) 334.

The petitioner also contends that it is a tax exempt corporation under section 101 (6), (8), or (14) of the code. Under subdivision (6) petitioner claims exemption as a corporation "organized and operated exclusively for   *   *   *   charitable   *   *   *   purposes   *   *   *   no part of the net earnings of which inures to the benefit of any private shareholder or individual   *   *   *." Under subdivision (8) it claims exemption as an organization "not organized for profit but operated exclusively for the promotion of social welfare   *   *   *   and the net earnings of which are devoted exclusively to charitable   *   *   *   purposes." Under subdivision (14) it claims exemption as a corporation "organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof less expenses to an organization which itself is exempt from the tax imposed by this chapter."

This and other courts have frequently stated that statutes creating an exemption must be strictly construed and that where a taxpayer is claiming an exemption it must meet squarely the tests laid down in the provision of the statute granting exemption. Petitioner does not meet the requirements of either subdivision (6), (8) or (14) of section 101. It was organized as a private business corporation and operated during the taxable years upon a profit basis. Its income after payment of expenses was used to pay interest on its outstanding bonds and for the retirement of bonds. No part of it was turned over to a charitable organization or was devoted to charitable purposes, and no part of it was turned over to an organization, such as the city of Keokuk, which itself is exempt from tax. Petitioner is not a tax exempt corporation under the statutory provisions upon which it relies.

As a final and alternative contention, the petitioner urges that it is entitled to amortization deductions for the cost of its bridge properties in the amount of its net income for each year. The assets acquired by petitioner consisted of real estate, personal property, and intangibles, i. e., franchises and licenses. The petitioner is not here claiming any depreciation deductions based on exhaustion, wear, and tear of its tangible properties, and clearly there is no justification for any amortization allowances based on exhaustion of such assets by passage of time. If the intangible properties of petitioner are exhausted "* * * by the passage of time or otherwise the petitioner is entitled to spread the amount paid * * * [therefor] over the determinable period of its life and to deduct an aliquot part thereof in each year." *Dallas Athletic Association*, 8 B. T. A. 1036, 1039–1040; *Rainbow Gasoline Corporation*, 31 B. T. A. 1050, 1056. There is no evidence, however, that the probable useful life of petitioner's intangible properties is limited to a fixed period of time. It follows, therefore, that petitioner is not entitled to amortization deductions for the costs of either its tangible or intangible properties.

Reviewed by the Court.

*Decision will be entered under Rule 50.*